FILED

02 JUN 11 PM 1:59

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CASE NO. 8:02-CV-1041-T-27 MAP

| | |
|---|---|
| DELANO COX, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| KENNETH R. VINES; HOWARD "SKIP" SPEAKS; BRIAN J. ANDREW; JOSEPH ANTINUCCI; STANLEY R. ARTHUR; BANDEL L. CARANO; JAMES F. GIBBONS; ROBERT P. GOODMAN; ARJUN GUPTA; JAMES WEI; CREDIT SUISSE FIRST BOSTON CORPORATION; DEUTSCHE BANC ALEX. BROWN; U.S. BANCORP PIPER JAFFRAY INC.; ERNST & YOUNG, LLP; U.S. TELESOURCE, INC.; and OAK INVESTMENT PARTNERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff, upon the investigation of plaintiff's counsel, which investigation included analysis of publicly-available news articles and reports, public filings, press releases and other matters of public record, and consultation with a forensic accountant.

## NATURE OF THE ACTION

1.     This is a class action on behalf of all purchasers of the common stock of Triton Network Systems, Inc. ("Triton" or the "Company") between July 13, 2000 and August 14, 2001

TO16 210
$150.00

1

inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the

"Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§1331, 1337 and 1367 and Section 22 of the Securities Act (15 U.S.C. § 77v); Section

27 of the Exchange Act (15 U.S.C. § 78aa).

3.     This action arises under Sections 11 and 15 of the Securities Act (15 U.S.C. § 77k

and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § § 78j(b) and 78t(a)) and

Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

4.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15

U.S.C.§ 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b)

and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects have occurred

within this District and Triton maintained its principal executive offices in this District.

5.     In connection with the acts and omissions alleged in this complaint, defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications, and the facilities of the national

securities markets.

## PARTIES

6.      Plaintiff purchased Triton common stock during the Class Period, as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

7.      The individual defendants, at all times relevant to this action, served in the capacities listed below and received substantial compensation:

| **Name** | **Position** |
| --- | --- |
| Kenneth Vines | Chief Financial Officer |
| Howard "Skip" Speaks | Chief Executive Officer And Director |
| Brian J. Andrew | Director |
| Joseph Antinucci | Director |
| Stanley R. Arthur | Director |
| Bandel L. Carano | Director |
| James F. Gibbons | Director |
| Robert Goodman | Director |
| Arjun Gupta | Director |
| James Wei | Director |

8.      The Individual Defendants, as senior officers and/or directors of Triton signed the Company's July 13, 2000 Registration Statement which included the materially false and misleading Prospectus described herein.

-3-

9.    Defendant Credit Suisse First Boston acted as the lead underwriter of the July 13, 2000 initial public offering of Triton common stock.

10.    Deutsche Banc Alex. Brown was an underwriter and co-manager of Triton's July 13, 2000 initial public offering of Triton common stock.

11.    U.S. Bancorp Piper Jaffray was an underwriter and co-manager of the Triton initial public offering of Triton common stock.

12.    Ernst & Young LLP is a public accounting firm and issued the audit opinion in connection with and contained in Triton's July 13, 2000 Registration Statement and Prospectus.

13.    U.S. Telesource, Inc., is a wholly-owned subsidiary of Quest Communications, is a shareholder of Triton.  At all material times, U.S. Telesource, Inc., was a control person of Triton.

14.    Oak Investment Partners, is a venture capital firm and a shareholder in Triton.  At all material times, Oak Investment Partners was a control person of Triton.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Triton common stock between July 13, 2000 to August 14, 2001, inclusive (the "Class Period"), including those who acquired stock pursuant to or traceable to the Registration Statement in connection with Triton's July 13, 2000 public offering (the "Offering Subclass") and who were damaged thereby.  Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Triton and the directors, officers and employees of Triton or its subsidiaries or affiliates, or any entity in which any excluded

-4-

person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

16.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States.  As of November 19, 2001 there were reportedly more than 35 million shares of Triton common stock outstanding.  Throughout the Class Period, Triton common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "TNSI".  Record owners and other members of the Class may be identified from records maintained by Triton and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        i.      whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

-5-

        ii.        whether the July 13, 2000 Registration Statement and Prospectus contained material false statements or omitted material information;

        iii.      whether defendants participated in and pursued the common course of conduct complained of herein;

        iv.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Triton;

        v.        whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Triton;

        vi.      whether the market price of Triton common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

        vii.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

    20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

21.     The prospectus for the July 13, 2000 offering states that the Company was founded in March 1997 and that it received orders from its first customers (CenturyTel and Advanced Radio Telecom) in December 1999.  In addition, the prospectus states that the Company recorded its first revenues during the quarter ended March 31, 2000.  Revenues for the second quarter of 2000 were not disclosed.  However, discussion of the magnitude of the Company's sales after March 31, 2000 were contained in the July 13, 2000 Triton Form S-1/A which stated: "We are currently shipping products to three significant customers. . . .  We entered into three-year supply agreements with Advanced Radio Telecom and CenturyTel in December 1999, and CAVU in April 2000.  We are currently engaged in field trials with other prospective customers.  Advanced Radio Telecom and CAVU are purchasing our products to provide broadband Internet services to businesses, and CenturyTel is purchasing our products to provide telephony, Internet and data services to businesses."  The Prospectus elaborated on the magnitude of the supply agreement with ART as follows:

> In December 1999, we entered into a three-year agreement with Advanced Radio Telecom.  Under this agreement, Advanced Radio Telecom has agreed to purchase 2,000 38 Gigahertz Invisible Fiber Internet units for delivery before December 31, 2000."  (March 1, 2000 Triton Form S-1)

22.     In addition, the March 1, 2000 Triton Form S-1 represented that, pursuant to the supply agreement, ART was obligated to purchase $1,000 RPSs (Radio Pair System which includes two IFUs (Invisible Fiber (TM) unit), mounting brackets and initial Software) to be delivered by December 31, 2000" at a price of "$31,500 per RPS" (with "170 RPSs to be delivered before June 30, 2000").

-7-

23.     Accordingly, the offering documents represented that <u>sales to ART</u> would be no less than $5,355,000 for the six months ended June 30, 2000 (170 x $31,500 = $5,355,000) and no less than $31,500,000 for the year ended December 31, 2000 (1,000 x $31,500 = $31,500,000), with material amounts of revenue in 2001.  The following statements on the magnitude of the supply agreements with CenturyTel and CAVU falsely represented to the investing public that total sales for the year 2000 would greatly exceed this $31,500,000 figure:

    o    "In December 1999, we entered into a three-year agreement with CenturyTel.  Under this agreement, CenturyTel has agreed to purchase 1,000 of our LMDS Invisible Fiber Fast Ethernet or OC-3/STM-1 units over a three-year period.  CenturyTel is obligated to purchase 500 of these units by December 31, 2000." (March 1, 2000 Triton Form S-1)

    o    "In April 2000, we entered into a three-year agreement with CAVU.  Under this agreement, CAVU has agreed to purchase 1,000 of our Local Multipoint Distribution Service Invisible Fiber Internet or SONET and 38 Gigahertz Invisible Fiber Internet or SONET units over a three-year period, of which 500 are to be delivered by December 31, 2000 and another 500 units by June 30, 2001."  (July 13, 2000 Triton Form S-1/A)

24.     The foregoing representations were false and misleading, particularly those representations regarding ART's firm commitment to purchase and pay for the above quantities.

25.     As set forth in the March 1, 2000 Form S-1, principal stockholders of the

Company ("The Consortium"), were:

| Name Or Group Of Beneficial Owners | Shares Beneficially Owned Prior To The Offering | |
|---|---|---|
| Bandel L. Carano | 7,880,570 | 15.4% |
| Entities affiliated with Oak Investment Partners | 7,860,570 | 15.3% |
| James Wei | 5,036,342 | 9.8% |
| Entities affiliated with Worldview Technology Partners | 5,016,342 | 9.8% |
| | | 50.3% |

26.     As set forth in ART's Form 14-A as filed with the SEC on May 16, 2000, The

Consortium beneficially owned shares of ART's stock as follows:

| Name Or Group Of Beneficial Owners | Shares Beneficially Owned As of March 21, 2000 | |
|---|---|---|
| Bandel Carano and Entities affiliated with Oak Investment Partners | 23,874,282 | 45.0% |
| James Wei and Entities affiliated with Worldview Technology Partners | 23,837,615 | 45.0% |
| | | 90.0% |

27.     Other information regarding members of the Consortium was disclosed as

follows:

    a)     "Bandel Carano, one of our directors, beneficially owns more than 10% of
           Triton, as a general partner of Oak Investment Partners VII, Limited
           Partnership and a related entity."  (May 19, 2000 amendment to the 1999
           ART Form 10-K)

-9-

b)    "As of December 19, 2000, our officers and directors and parties related to them will control approximately 14% of the voting power of our outstanding capital stock.  Further, holders of our preferred stock representing approximately 14% of our voting power as of December 19, 2000 have agreed to vote as jointly directed by our two stockholders, U.S. Telesource, Inc., a wholly owned subsidiary of Qwest Communications International Inc. and Oak Investment Partners.  In addition, each of U.S. Telesource and Oak currently has the right to designate a director.  Therefore, the officers and directors and related parties, particularly U.S. Telesource and Oak, are able to significantly influence any matter requiring shareholder approval.") (December 28, 2000 ART From S-3/A)

c)    "Bandel L. Carano has served on our board of directors since November 1997.  He has been a general partner of Oak Investment Partners, a venture capital firm, since 1985....  Mr. Carano also serves as a director of Advanced Radio Telecom." (July 13, 2000 Triton Form S-1/A)

d)    "James Wei has served on our board of directors since November 1997.... Entities associated with Oak Investment Partners, of which Bandel Carano, one of our directors, is a general partner, Worldview Technology Partners, of which James Wei, one of our directors, is a general partner, and other stockholders of ours have invested in Advanced Radio Telecom...". (July 13, 2000 Triton Form S-1/A)

28.    Representations regarding the Company's three year supply agreement with ART were materially false and misleading because, as revealed in a Company press release less than four months after the completion of the offering (on November 14, 2000), ART, "a key customer" that had previously been represented in the offering as having issued "firm purchase orders", had requested that the Company "postpone delivery" of the ordered units until "after it [ART] obtains additional financing..."  ART filed for bankruptcy on March 30, 2001.

29.    Due to the commonality of control, at the time of the offering, Defendants and members of The Consortium (in violation of GAAP -- SOP 94-6) failed to disclose the imminent severe impact to be sustained as a result of ART's inability to continue its operations.

30.     Moreover, due to the commonality of control, at the time of the offering, Defendants and members of The Consortium failed to disclose the fact that ART did not have the resources to honor its agreement with the Company and that, accordingly, representations regarding the Company's three year supply agreement with ART which were contained in the Prospectus were materially false and misleading.  Defendants and members of The Consortium thus failed to disclose that the Company would be entering into material purchase commitments and ordering material amounts of product components, parts and supplies to fulfill its obligations to deliver products to ART that ART could not pay for and that the Company would not be able to sell to others; and that the company was likely to sustain losses of no less than $19.2 million as a result.  The $19.2 million in losses, represented approximately 22% of the aggregate net proceeds (of approximately $86.5 million) which the Company received from the offering.

31.     GAAP (Statement Of Financial Accounting Standards No. 57, Related Party Disclosures -- "FASB No. 57") defines related parties as follows:

> Affiliates of the enterprise...principal owners of the enterprise; its management; members of the immediate families of principal owners of the enterprise and its management; and other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.  Another party also is a related party if it can significantly influence the management or operating policies of the transacting parties or if it has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

32.     Under this definition, Advanced Radio Telecom and the Company were related parties.

33.     The company's March 1, 2000 Form S-1 also disclosed that Brian J. Andrew was one of the Company's founders and served as the Company's President and Chief Executive Officer from March 1997 to September 1999.  He resigned these positions to become President and Chief Executive Officer of CAVU, although he continued to serve on the Company's Board until shortly after the Company's March 7, 2000 Form S-1/A was filed with the SEC and he continued to serve as a consultant to the Company through the completion of the offering, at which time he was the beneficial owner of 2.7% of the Company's stock.  Accordingly, CAVU was also a related party.

34.     While certain facts regarding the various related parties were disclosed, in contravention of FASB No.57, the financial statements which were contained within the Prospectus failed to disclose:

      a)     The nature of the relationships involved.

      b)     A description of the transactions between the related parties, including transactions to which no amounts or nominal amounts were ascribed, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

      c)     The dollar amounts of the transactions between the related parties.

      d)     The amounts due from or to the related parties and the terms and manner of settlement.

35.     As proof of "a" through "d" above and Defendants' material non-disclosures and misrepresentations, the Prospectus states "we recognized our initial revenue in the first quarter of 2000," whereas ART's 1999 Form 10-K/A, filed with the SEC on May 19, 2000, states: "In

December 1999, we entered into a supply agreement with Triton Network Systems Inc. under which we were obligated to purchase and Triton is obligated to supply their products under the terms and conditions described in the agreement....During 1999, we paid approximately $693,000 to Triton."

## COUNT I

**Against Defendants Vines, Speaks, Andrew, Anticucci, Arthur, Carano, Gibbons, Goodman, Gupta, Wei, Credit Swiss First Boston, Deutsche Banc, Alex, Brown, U.S. Bancorp. Piper Jaffray and Ernst & Young, LLP, and CIBC**
**Under Section 11 of the Securities Act**

36.     This Count is brought by plaintiff Delano Cox pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77v. on behalf of all persons who purchased the common stock of Triton on or traceable to the July 13, 2000 Offering. This count is asserted against defendants Vines, Speaks, Andrew, Anticucci, Arthur, Carano, Gibbons, Goodman, Gupta, Wei, Credit Swiss First Boston, Deutsche Banc, Alex, Brown, U.S. Bancorp. Piper Jaffray and Ernst & Young, LLP.

37.     Plaintiff Cox repeats and realleges each and every allegation contained in the above paragraphs, as if fully set forth herein. As set forth above, with respect to this Count, plaintiff specifically excludes any allegation of scienter or fraudulent intent.

38.     The Registration Statement, which included the Prospectus for the Offering, was materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

39.     The Company is the registrant for the Offering.  The Underwriter Defendants were the underwriters of the Triton common stock sold in the Offering as defined in § 11(a)(5) of the Securities Act.  The defendants named herein were responsible for the contents and dissemination of the Prospectus and caused its filing with the SEC.  Defendants Vines, Speaks, Andrew, Antinucci, Arthur, Carano, Gibbons, Goodman, Gupta and Wei, signed the Registration Statement for the Offering.

40.     As underwriters for the Offering, the Underwriter Defendants have statutory liability for any materially false and misleading statements in the Registration Statement.  As such, the Underwriter Defendants are liable to Plaintiff Cox and the Offering SubClass.

41.     Defendants Ernst & Young LLP expertised portions of the Registration Statement and Prospectus and included an audit opinion in the Prospectus for the offering.

42.     Plaintiff Cox and the Offering SubClass have sustained damages.  The value of common stock is less than the price paid by plaintiff and other members of the Subclass.

43.     At the time Plaintiff Cox and the other members of the Offering SubClass purchased Triton common stock, they were without knowledge of the facts concerning the wrongful conduct alleged above and could not have reasonably discovered those facts prior to the end of the class period.  Less than one year has elapsed from the time that the Offering SubClass discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiff Cox filed this Complaint.  Less than three years have elapsed from the time that Triton's common stock upon which this claim is brought was *bona fide* offered to the public to the time when Plaintiff Cox filed this complaint.

-14-

## COUNT II

### Against Defendants, Vines, Speaks, U.S. Telesource, Inc., and Oak Investment Partners
### For Violations of Section 15 of the Securities Act

44.      This claim is brought by Plaintiff Cox pursuant to Section 15 of the Securities Act

against defendants Vines, Speaks, U.S. Telesource, Inc., and Oak Investment Partners, pursuant

to § 15 of the Securities Act, 15 U.S.C.§ 77o.   The claim asserted in Count II is not based on any

allegation of fraud set forth above and no such allegation is incorporated herein.

45.      Defendants Vines, Speaks, U.S. Telesource, Inc., and Oak Investment Partners, by

reason of their stock ownership, management position , and/or membership on the Company's

Board of Directors, were controlling persons of the Company and had the power and influence,

and exercised the same, to cause Triton to engage in the violations of law complained of herein.

Vines, Speaks, U.S. Telesource, Inc., and Oak Investment Partners are liable under § 15 of the

Securities Act.

## THE EXCHANGE ACT CLAIMS

46.      The Company filed its Form 10-Q for the quarterly period ended June 30, 2000

with the SEC on August 14, 2000.  This document contained financial statements for the period

ended June 30, 2000 and an appended management representation which stated: "In the opinion

of management, such interim financial information includes all adjustments, consisting of normal

recurring adjustments, necessary for a fair presentation of the results for such interim periods."

47.      This statement was materially false and misleading because the Company's

financial statements did not include all adjustments, consisting of normal recurring adjustments,

necessary for a "fair presentation" (as defined in authoritative literature -- AU Section 411) of the results for such interim periods due to the fact that:

    a)     The Company applied a non-GAAP accounting method (the direct write-off method) which resulted in a material $2.7 Million under-provision for bad debts.

    b)     The financial statements, including the related notes, failed to provide the disclosures required by GAAP as discussed above were, therefore, not informative of those material matters that affected their use, understanding, and interpretation.

48.    On Monday November 14, 2000, the Company issued a press release announcing a revision to its previous fourth quarter 2000 financial objectives "as a key customer, Advanced Radio Telecom (Nasdaq: ARTT- news), has rescheduled product deliveries from the fourth quarter of 2000 into 2001."  The press release also stated:

> Although the company had previously received firm purchase orders from ART for a significant number of Invisible Fiber units, ART has informed Triton Network Systems (TM) that it has slowed down the rate of network deployments, in order to conserve cash.  As a result, ART has requested that Triton Network Systems postpone delivery of a portion of fourth quarter shipments until 2001.

49.    Additionally, the November 14, 2000 press release quoted Skip Speaks, the Company's president and chief executive officer as stating: "...we expect to increase shipments to ART after it obtains additional financing...".

50.    The November 14, 2000 press release was materially false and misleading because there was no basis for stating that ART would ever obtain additional financing or that shipment of products to ART would resume in 2001.

-16-

51.     The Company filed its Form 10-Q for the quarterly period ended September 30, 2000 with the SEC on November 14, 2000.  This document contained financial statements for the period ended September 30, 2000 and an appended management representation which was substantially identical to the one described in paragraph 16 above.  This statement was materially false and misleading for the reasons set forth in paragraph 47 above.

52.     The Company filed its Form 10-K for the year ended December 31, 2000 with the SEC on April 2, 2001 ("the 2000 Form 10-K").  This document, signed by Vines, was materially false and misleading for the reasons set forth in paragraph 48 above.  In addition, the financial statements which appeared in this document were materially false and misleading because, in contravention of GAAP (FASB Statement No. 121, Accounting Research Bulletin No. 43 and FASB Statement No. 5), the Company failed to write off worthless intangible assets in the sum of $32,989,000 and the Company failed to recognize a provision for loss on excess inventory and inventory purchase commitments in the sum of $16.5 million.

53.     Defendants' knowledge of the worthlessness of the Company's intangible assets and impairment of the Company's inventory by the April 2, 2001 date of filing of the 2000 Form 10-K may be inferred from the following disclosure which appeared in a Form 14A filed with the SEC on September 12, 2001:

> In January 2001, the Company engaged Broadview International to assist in identifying and evaluating strategic alternatives, including the sale or merger of the Company.  Broadview contacted a large number of prospective acquirers or merger partners, both domestic and international.  Discussions were held with a number of companies.  After a careful review, the Board of Directors concluded that none of the acquisition or merger opportunities available to the Company would be likely to provide stockholders

-17-

with as much liquidity or value as could be achieved through a
liquidation and dissolution.

54.     The Company filed its Form 10-Q for the quarterly period ended March 31, 2001
with the SEC on May 15, 2001.  This document, signed by defendant Vines, contained financial
statements for the period ended March 31, 2001 and an appended management representation
which was substantially identical to the one described in paragraph 47 above.  This statement
was materially false and misleading for the reasons set forth in paragraph 48(b) above.  In
addition, the financial statements contained within the March 31, 2001 Form 10-K were
materially false and misleading because they failed to recognize the worthlessness of intangible
assets in the sum of $31,048,875 and a provision for loss on excess inventory and inventory
purchase commitments in the sum of $10 million

55.     The Company filed its Form 10-Q for the quarterly period ended June 30, 2001
with the SEC on August 14, 2001.  This document signed by Vines, contained financial
statements for the period ended June 30, 2001 and an appended management representation
which was substantially identical to the one described in paragraph 47 above.  This statement
was materially false and misleading for the reasons set forth in paragraph 48(b) above.  In
addition, the financial statements which were contained within the March 31, 2001 Form 10-K
were materially false and misleading because they failed to recognize the worthlessness of
intangible assets in the sum of $29,108,319.

## THE TRUTH EMERGES

56.     On August 6, 2001, defendant Speaks told reporters, "We are positioned to expand our product and customer base when the anticipated market recover occurs in the U.S." (The Orlando Sentinel, Aug. 6, 2001).

57.     On August 21, 2001, The New York Times reported that Triton "said it had decided to close the Company and sell its assets, pending shareholder approval."

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

58.     At all relevant times, the market for Triton common stock was an efficient market for the following reasons, among others:

(i)     Triton common stock met the requirements for listing, and was listed and actively traded, on the Nasdaq, a highly efficient market;

(ii)    As a regulated issuer, Triton filed periodic public reports with the SEC;

(iii)   Triton stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sale force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

(iv)    Triton regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

59.     As a result, the market for Triton securities promptly digested current information with respect to Triton from all publicly-available sources and reflected such information in Triton's stock price.  Under these circumstances, all purchasers of Triton common stock during

-19-

the Class Period suffered similar injury through their purchase of stock at artificially inflated

prices and a presumption of reliance applies.

## NO SAFE HARBOR

60.     The statutory safe harbor provides for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

The specific statement pleaded herein were not identified as "forward-looking statements" when

made.  Nor was it stated with respect to any of the statements forming the basis of this complaint

that actual results "could differ materially from those projected."   To the extent there were any

forward-looking statements, there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly

forward-looking statements.  Alternately, to the extent that the statutory safe harbor does not

apply to any forward-looking statements pleaded herein, defendants are liable for those false

forward-looking statements because at the time each of those forward-looking was made the

particular speaker knew that the particular forward-looking statement was false, and/or the

forward-looking statement was authorized and/or approved by an executive officer of Triton who

knew that those statements were false when made.

## SCIENTER ALLEGATIONS

61.     As alleged herein, defendants acted with scienter in that defendants knew that the

public documents and statements, issued or disseminated by or in the name of the Company were

materially false and misleading; knew or recklessly disregarded that such statements or

documents would be issued or disseminated to the investing public; and knowingly and

substantially participated or acquiesced in the issuance of dissemination of such statements or

documents as primary violators of the federal securities laws.  As set fort elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Triton and its business practices, their control over and/or receipt of Triton's allegedly materially misleading misstatements and/or associations with the Company which made them privy to confidential proprietary information concerning Triton were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances and operations.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

62.     The Individual Defendants engaged in such as scheme to inflate the price of Triton common stock in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; and (ii) enhance the value of their personal holdings of Triton common stock and options.

### COUNT III

**(Violations Of Section 10(b) Of The Exchange Act
And Rule 10b-5 Promulgated Thereunder Against
Defendants Vines and Speaks**

63.     Plaintiff repeats and realleges each and every allegation contained above.

64.     Each of the defendants:  (a) knew or recklessly disregarded material adverse non-public information about Triton's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Triton.

65.     During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Triton stock during the Class Period.

67.     Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Triton stock.  Plaintiff and the Class would not have purchased Triton stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## COUNT IV

### (Violation Of Section 20(a) Of The Exchange Act
### Against Vines, Speaks, U.S. Telesource, Inc., and Oak Investment Partners

68.    Plaintiff repeats and realleges each and every allegation contained above.

69.    The Individual Defendants acted as controlling persons of Triton within the meaning of Section 20(a) of the Exchange Act.  By reason of their senior executive and/or Board positions they had the power and authority to cause Triton to engage in the wrongful conduct complained of herein.

70.    By reason of such wrongful conduct, Triton and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Triton stock during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

1)    Determining that this action is a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

2)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: June 10, 2002

<div style="margin-left:40%">

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**

By: _Maya Saxena_
Kenneth J. Vianale
Fla. Bar No. 169668
Maya Saxena
Fla. Bar No. 0095494
Tara Isaacson
Fla. Bar. No. 0492183
5355 Town Center Road, Suite 900
Boca Raton, FL  33486
Tel: (561) 361-5000
Fax: (561) 367-8400

-and-
Steven G. Schulman
Samuel H. Rudman
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

**STULL STULL & BRODY**
Jules Brody
Aaron Brody
6 East 45th Street
Suite 500
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

**Attorneys for Plaintiff**

</div>

-24-

# PLAINTIFF CERTIFICATION

_Delano Cox_____ ("Plaintiff") hereby states that:

1.      Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.      Plaintiff did not purchase any common stock/securities of **Triton Network Systems, Inc.** at the direction of his/her counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The following includes all of Plaintiff's transactions in **Triton Network Systems, Inc.** common stock/securities during the class period specified in the complaint:

| SECURITY (Common Stock, Call, Put, Bonds) | TRANSACTION (Purchase, Sale) | TRADE DATE | PRICE PER SECURITIES/SHARE | QUANTITY |
|---|---|---|---|---|
| Common Stock | Purchase | 7-27-00 | 38. — | 944 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Please list other transactions on a separate sheet of paper, if necessary.**

5.      Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years, unless otherwise stated in the space below:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this _26_ day of _Jan_____, 2002 in _____Monroe_____, _N.C.__.
                                                             (City)                    (State)

_____
                              Signature