FILED

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

03 SEP 26 PM 4: 38

`T COURT`
`MIDDLE DISTRICT OF FLORIDA`
`TAMPA, FLORIDA`

IN RE TRITON NETWORK SYSTEMS, INC.
SECURITIES LITIGATION

### Case No. 8:02-CV-1041-T-27MAP

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS
## THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**BEFORE THE COURT** are Defendants' Motions to Dismiss the Consolidated Amended

Class Action Complaint ("Complaint") (Dkts. 52, 54, 58). Upon consideration of the motions and

oral argument of the parties on September 4, 2003, Defendants' motions are granted in reliance upon

the Eleventh Circuit decisions in Theoharous v. Fong, 256 F.3d 1219 (11th Cir. 2001) and Franze v.

Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002). Where, as here, the factual allegations

of a complaint demonstrate that it is time-barred, the complaint fails to state a cause of action and

should be dismissed. See, e.g., Radford General Dynamics Corp., 151 F.3d 396 (5th Cir. 1998);

Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).

## I.   Introduction

Plaintiffs sued Defendants in this putative class action contending that Defendants committed

securities fraud by misleading them into investing in Triton Network Systems, Inc. (Dkt. 47).

Specifically, Plaintiffs assert claims against Kenneth Vines, Howard "Skip" Speaks, Brian J.

Andrew, Robert Goodman, Joseph Antinucci, Stanley R. Arthur, Bandel L. Carano, James F.

Gibbons, Arjun Gupta and James Wei[1] (collectively, the "Individual Defendants") as officers,

---

[1] Vines was the Senior Vice President and Chief Financial Officer of Triton. (Dkt. 47, ¶ 36).
Speaks was the President, Chief Executive Officer and Director of Triton as well as a member of Triton's
Executive Committee. Id. Andrew was a director and co-founder of Triton. Id. Goodman was a director
of Triton, a member of Triton's executive committee and a member of Triton's compensation committee.
Id. Antinucci was a director of Triton at the time of Triton's initial public offering. Id. Arthur was a
director of Triton and a member of the audit committee. Id. Carano was a director of Triton and a
member of the executive and compensation committees. Id. Carano was also a director of ART, one of
Triton's largest customers. Id. Gibbons was a director of Triton. Id. Gupta was a director and member
of Triton's audit and compensation committees. Id. Wei was a director of Triton's audit committee. Id.



directors or control persons of Triton pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77v

(Count I), Section 15 of the Securities Act, 15 U.S.C. § 77o (Count II), Section 10(b) of the

Exchange Act and Rule 10b-5 (Count III), and Section 20(a) of the Exchange Act.  (Dkt. 47).

Plaintiffs sued Defendants Credit Suisse First Boston, Deutsche Banc Alex and U.S. Bancorp Piper

Jaffray (collectively, the "Underwriter Defendants") for violating the provisions of Section 11 of the

Securities Act, 15 U.S.C. § 77v (Count I).  Plaintiffs sued Ernst & Young, L.L.P. ("E&Y") for

violating the provisions of Section 11 of the Securities Act, 15 U.S.C. § 77v (Count I), Section 10(b)

of the Exchange Act and Rule 10b-5 (Count III). Defendants have moved to dismiss all of the

Plaintiffs' claims as a matter of law, arguing that the claims are barred by the applicable statute of

limitations.[2]  (Dkts. 52, 54, 58).  Defendants are correct.

As articulated in the Individual Defendants' Motion to Dismiss, the factual allegations of

the Consolidated Amended Class Action Complaint demonstrate that this action is time-barred:

> First, it is clear on the face of the Complaint that plaintiffs were on
> "inquiry" notice of their claims just four months after the IPO, and
> *more than a year and a half* before they sued. On November 14,
> 2000, Triton issued a press release which caused an immediate 50
> percent drop in the Company's stock price by revealing that its most
> important customer, Advanced Radio Telecom ("ART"), was
> experiencing financial difficulties jeopardizing a supply agreement
> that was fundamental to Triton's success. CAC ¶¶ 70, 150.
> Nonetheless, plaintiffs waited some 19 months to bring suit alleging
> that Triton had misrepresented the ART agreement as "firm" and had
> concealed ART's financial difficulties, thereby overstating Triton's
> own revenues and prospects. These claims, as well as plaintiffs' other
> claims -- which an earlier investigation would have uncovered to the
> same extent as the investigation eventually conducted – are time-
> barred.

---

[2] The Defendants have raised a litany of challenges to the Complaint.  Because the statute of
limitations argument is dispositive, it is unnecessary to address the additional challenges.

( Dkt. 53 at 1-2).  As similarly articulated by Ernst & Young in its Motion to Dismiss:

> Plaintiffs were on inquiry notice of one of the cornerstones of Triton's alleged fraud – its supposed misrepresentations about ART's ability to honor its commitments – more than a year before the first complaint was filed in this case. In November 2000, Triton announced that ART was requesting a delay of deliveries in order to "conserve cash" until it "obtained additional financing." Am. Cplt. ¶¶ 71, 150. Such a clear statement that ART was experiencing cash flow deficiencies was "sufficient to put [the plaintiff] on inquiry notice of the possibility" that Triton had made a misstatement "with its prior assurances of [ART's] financial health." *Theoharous*, 256 F.3d at 1228. Particularly when coupled with ART's bankruptcy filing, which was announced by Triton in March 2001, these disclosures imposed a duty on plaintiffs to inquire into the accuracy of Triton's statements regarding its financial condition.

(Dkt. 59 at 18-19).

## II.   Factual Background[3]

Triton was a manufacturer of high-powered microwave radio transmitters for the telecommunication industry. (Dkt. 47, Compl. ¶ 1). The microwave radios were designed to enable internet service providers and other companies to deliver high speed internet service access to their customers through the use of a radio transmitter manufactured by Triton without the need for underground fiber optic cables. (Dkt. 47, Compl. ¶¶ 1, 35).

Triton's "key" customers were Advanced Radio Telecom ("ART"), CAVU and Century Tel, high speed internet providers. (Dkt. 47, Compl. ¶ 1); (Dkt. 57, Ex. A, Prospectus at 4-5, 9). ART shared at least one director with Triton since Defendant Bandel L. Carano was a director of ART during the same time he served as a director of Triton.  (Dkt. 47, Compl. ¶ 23).  Additionally, Defendant Brian Andrew was the Chief Executive Officer of CAVU during the same time that he served as a director of Triton. (Dkt. 47, Compl. ¶¶ 1, 23).

---

[3] All well-pleaded factual allegations are accepted as true and are viewed in the light most favorable to the nonmoving party.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

*Triton's Prospectus*

On July 13, 2000, Triton filed a prospectus in connection with its initial public offering. (Dkt. 47, Compl. ¶ 2); (Dkt. 57, Ex. A, Prospectus). The prospectus disclosed that Triton's products contained errors that its customers had discovered from "time to time." (Dkt. 57, Ex. A at 14). The prospectus did not disclose the exact extent of the errors, however. (Dkt. 47, Compl. ¶¶ 48-56). Triton's product had as much as a 50% failure rate and had electrical and mechanical defects. (Dkt. 47, Compl. ¶ 49).

According to Plaintiffs, the prospectus falsely misstated Triton's revenues. (Dkt. 47, Compl. ¶¶ 57-64). Triton's prospectus and other SEC filings were allegedly misleading and false since Triton recognized revenue for its product at the time the product was shipped rather than when payment was actually received. (Dkt. 47, Compl. ¶¶ 58, 60). According to Plaintiffs, because of defects, Triton's products were frequently returned and as a result, Triton did not actually collect payment for much of its returned, defective products. (Dkt. 47, Compl. ¶¶ 58, 61-62).

The prospectus also disclosed that Triton depended upon its "key customers" for "substantially all of [its] sales and the loss of one or more of them . . . could significantly reduce [its] revenues." (Dkt. 57, Ex. A at 9). Triton's major customers were CAVU, Advanced Radio Telecom ("ART") and Century Tel. (Dkt. 47, Compl. ¶ 23). Triton reported that it had entered into long-term supply agreements with these key customers. (Dkt. 47, Compl. ¶ 68-70).

In March 2000, Triton acquired certain assets from IBM which was reflected in Triton's prospectus. (Dkt. 47, Compl. ¶ 78). Triton valued the asset purchase at $15 per share or $41 million. (Dkt. 47, Compl. ¶ 77). Triton made the purchase with restricted series C preferred Triton stock, which had been valued at $10 per share five months prior to the IBM asset purchase. (Dkt.

4

47, Compl. ¶ 80). The IBM assets were sold less than two years later, in March 2002, for $103,000.

(Dkt. 47, Compl. ¶ 81). According to Plaintiffs, Triton inflated the value of the IBM asset purchase

in its 2000 financial statements. (Dkt. 47, Compl. ¶ 82).

Triton's prospectus also included an Ernst & Young auditing report, in which Ernst & Young

had issued an opinion certifying Triton's 1999 financial statements. (Dkt. 57, Ex. A at F-1 through

F-20). Triton did not recognize any revenue in 1999. (Dkt. 57, Ex. A at F-4); (Dkt. 47, Compl. ¶

59). [4]

Triton's initial public offering ("IPO") was completed on July 17, 2000. (Dkt. 47, Compl.

¶ 2). As a result, Triton sold 6,325,000 shares of common stock and generated proceeds of

approximately $86 million. (Dkt. 47, Compl. ¶ 2). The underwriters of the offering were

Defendants Credit Suisse First Boston, Deutsche Banc Alex Brown and U.S. Bancorp Piper Jaffray.

(Dkt. 47, Compl. ¶¶ 38-40).

### Reports of Triton's Success

In press releases issued in July and October 2000, Triton touted its financial results. (Dkt.

47, Compl. ¶¶ 116-119). Similarly, in its Form 10-Q filed with the Securities and Exchange

Commission in June 2000, Triton asserted positive financial results. Id. Triton's President, Howard

"Skip" Speaks stated:

> I am extremely pleased with the success Triton Network Systems has
> achieved to date. The revenue growth of 49% in the second quarter
> of 2000 and the improvement in gross margins is aligned with our
> expectations for this state of our Company's development.

> Additionally, investor confidence in our Company as shown by our
> initial public offering in validation of the vision of Triton's founders,
> employees and initial investors.

(Dkt. 47, Compl. ¶ 116).

---

[4] Ernst & Young reviewed, but did not audit Triton's 2000 financial statements. (Dkt. 57, Ex. A at F-3, F-7); (Dkt. 47, Compl. ¶ 19).

According to Plaintiffs, the reported revenues, inventory, intangible assets and reports concerning future growth were false and misleading. (Dkt. 47, Compl. ¶¶ 118-123). They allege that the represented revenues of approximately $5.2 million were inflated to the extent that Triton reported as sales products which had been shipped to customers without regard to defective products which had been or would be returned. (Dkt. 47, Compl. ¶121). Plaintiffs allege that the represented $13 million in inventory was false because that figure included malfunctioning and defective products for which there was no market. (Dkt. 47, Compl. ¶ 122). Plaintiffs allege that the $36 million of represented intangible assets was misleading for the same reasons. (Dkt. 47, Compl. ¶ 123).

On October 24, 2000, Triton issued a press release favorably highlighting its third quarter 2000 financial results. (Dkt. 47, Compl. ¶ 134). The release was titled, "Triton Network Systems, Inc. Reports Third Quarter 2000 Results; Revenues Increase by 54% Over Second Quarter 2000." Discussing Triton's growth, Speaks stated:

> We are very pleased with the progress we've made this quarter. Revenues grew substantially; and gross margin and net loss also improved. Our existing customers continue to ramp their network rollout efforts bringing wireless access to a growing number of end users.

(Dkt. 47, Compl. ¶ 134).

Additionally, in November 2000, Triton filed its Form 10-Q for the quarterly period ending September 30, 2000 with the SEC. (Dkt. 47, Compl. ¶ 136). The Form 10-Q reported revenues of eight million dollars, inventory in the amount of $16 million and intangible assets of $34 million. Id. For the same reasons Triton's June 2000 Form 10-Q misstated its financial circumstances, Plaintiffs maintain Triton's November 2000 10-Q was false and misleading. (Dkt. 47, Compl. ¶ 138-142).

Triton's President, Howard Speaks, was interviewed at a technology conference which was held on November 13-16, 2000.  (Dkt. 47, Compl. ¶ 146).  He stated:

> The product is a very powerful millimeterwave, transmitter-receiver pair which allows us to build superior broadband wireless solutions. It has all the advantages of fiber optic, that is, carrier-class performance and high bandwidth, but it doesn't have the limitation, which is, you don't have to bury it underground; it goes through the air.
> So the net is, we are a complete network solution for broadband fixed wireless access, we're really focused on fast Ethernet and SONET .
> . . .

(Dkt. 47, Compl. ¶ 146).  He also stated, "We fully believe that our current customers have very solid business plans and will be successful."  (Dkt. 148).

### Triton's November 14, 2000 Press Release

On November 14, 2000, four months after the IPO was completed, Triton issued a press release disclosing that ART had asked Triton to postpone delivery of shipments to "conserve cash" until it "obtained additional financing."  (Dkt. 47, Compl. ¶ 150).  In response to the press release, Triton's stock price dropped 50%.  (Dkt. 47, Compl. ¶¶ 150-151).

### ART's Bankruptcy

In March 2001, just five months after Triton's press release concerning ART's financial woes, ART announced it was filing for bankruptcy protection.  (Dkt. 47, Compl. ¶ 154).  ART filed for bankruptcy on April 20, 2001 (Dkt. 47, Compl. ¶¶ 71).[5]

### Triton's Liquidation

On August 20, 2001, Triton's Board of Directors announced that it had voted to liquidate

---

[5] CAVU, another key customer of Triton, filed for bankruptcy on December 4, 2001.  (Dkt. 47, Compl. ¶¶ 72).

Triton as a result of "the Company's recent financial performance, prevailing economic conditions and unsuccessful efforts to sell or merge the Company." (Dkt. 47, Compl. ¶ 217). A certificate of dissolution was filed on January 31, 2002. (Dkt. 47, Compl. ¶ 28).

### *Plaintiffs*

Plaintiffs first purchased Triton stock in July and September 2000. (Dkt. 36, Ex. C, Co-Lead Plaintiff Ghaeenzadeh); (Dkt. 33, Ex. C at 4, Co-Lead Plaintiff Heath); see also (Dkt. 44, Order). They commenced this lawsuit on June 11, 2002. (Dkt. 1).

### III.   Applicable Standards

A court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (citations omitted); accord South Florida Water Management Dist. v. Montalvo, 84 F.3d 402, 406 (11th Cir. 1996). All well-pleaded factual allegations are accepted as true and are viewed in the light most favorable to the nonmoving party. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). The threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. Ancata v. Prison Health Services, Inc., 769 F.2d 700, 703 (11th Cir. 1985).[6] However, a complaint may be dismissed on a dispositive issue of law. See

---

[6] A motion dismiss for failure to state a claim merely tests the sufficiency of the factual allegations in the complaint; it does not decide the merits of the claim. See Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). Generally, in considering a motion to dismiss, courts are confined to examining the four corners of the complaint. Anderson v. Transglobe Energy Corp., 35 F.Supp. 2d 1363, 1366 (M.D. Fla. 1999). Courts may, however, take judicial notice of relevant documents publicly-filed with the Securities Exchange Commission ("SEC"). Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1287 (11th Cir. 1999). Additionally, if the plaintiff refers to particular documents in the complaint and those documents are central to the plaintiff's claim, those documents may be considered as a part of the pleadings for purposes of a Rule 12(b)(6) motion. Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1368-69 (11th Cir. 1997). Further, under Rule 201, courts are required to take judicial notice of facts if requested by a party and the necessary information is supplied.

Marshall County Bd. of Educ. v Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).

Where, as here, the allegations of the complaint demonstrate that it is barred by the statute of

limitations, dismissal is appropriate. Theoharous v. Fong, 256 F.3d 1219, 1228 (11th Cir. 2001).

## IV.   Discussion

The claims asserted against Defendants are all subject to the same one-year statute of

limitation period. Specifically, a Section 11 violation claim must be brought within one year after

discovery of the untrue statement or omission, or after such discovery should have been made by the

exercise of reasonable diligence . . . ." 15 U.S.C. § 77m.[7] Claims under Section 10(b) and Rule 10b-

5 "must be commenced within one year after the discovery of the facts constituting the violation and

within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,

501 U.S. 350, 364 (1991). Claims under Sections 15 and 20 are governed by the same limitations

period that governs the Section 11, Section 10(b) and Rule 10b-5 claims. See Theoharous, 256 F.3d

at 1228, n. 12 (due to the derivative nature of Section 20(a) claims, "the same limitations period

applies to claims under that section"); Herm v. Stafford, 663 F.2d 669, 679 (6th Cir. 1981) ("Since

the liability of the controlling person is joint and several with the controlled person, the same

limitations period logically applies to the controlling person.").

---

[7] Section 77m expressly provides:

> No action shall be maintained to enforce any liability created under section
> 77k or 77l(a)(2) of this title unless brought within one year after the
> discovery of the untrue statement or the omission, or after such discovery
> should have been made by the exercise of reasonable diligence, or, if the
> action is to enforce a liability created under section 77l(a)(1) of this title,
> unless brought within one year after the violation upon which it is based.
> In no event shall any such action be brought to enforce a liability created
> under section 77k or 77l(a)(1) of this title more than three years after the
> security was bonafide offered to the public, or under section 77l(a)(2) of
> this title more than three years after the sale.

15 U.S.C. § 77m.

The statute of limitations begins to run when a potential plaintiff has discovered the alleged violation. Theoharous, 256 F.3d at 1228. "Discovery" occurs when a potential plaintiff has inquiry or actual notice of a violation. Id. at 1228; Anderson v. Transglobe Energy Corp., 35 F.Supp. 2d 1363, 1370 (M.D. Fla. 1999). "Inquiry notice is the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed." Theoharous, 256 F.2d at 1228; see also Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002) (inquiry notice is an objective standard). A claim will be barred if publicly- available information or documents "sufficiently alert [] the plaintiffs to the possibility of the fraud." Theoharous, 256 F.2d at 1228. Further,

> Plaintiff need not . . . have fully discovered the nature and extent of the fraud before [he is] on notice that something may have been amiss. Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself.

Id. (quoting Sterlin v. Biomune Systems, 154 F.3d 1191, 1203 (10th Cir. 1998) (emphasis in original). The defendant has the burden of production and persuasion in establishing a statute of limitations defense. Smith v. Duff and Phelps, Inc., 5 F.3d 488, 492, n.9 (11th Cir. 1993).

Defendants maintain that Plaintiffs were on inquiry notice of their claims either (1) when the two lead Plaintiffs purchased their shares in July and September 2000 in reliance on Triton's prospectus, (2) when Triton announced in November 2000 that ART, its key customer, was delaying delivery of Triton's product in order to conserve cash and in any event, (3) no later than March 2001, when it was announced that ART was filing for bankruptcy protection. (Dkts. 52, 58, 64).

## A.    Prospectus: Notice Regarding "Accounting Gimmickry"

Plaintiffs first purchased Triton stock in July and September 2000. (Dkt. 36, Ex. C, Co-Lead

10

Plaintiff Ghaeenzadeh); (Dkt. 33, Ex. C at 4, Co-Lead Plaintiff Heath); see also (Dkt. 44, Order).

At that time, the prospectus provided financial information concerning Triton's purchase of assets

from IBM valued at $41 million. (Dkt. 57, Ex. A at 25).   The assets' value was based on a $15 per

share IPO price of Triton's stock.  (Dkt. 47, Compl. ¶ 11); (Dkt. 57, Ex. A at F-19).  Plaintiffs

acknowledge in the Complaint that five months prior to Triton's purchase of IBM's assets, Triton's

stock was valued at only $10.00 per share.  (Dkt. 47, Compl. ¶ 11).  Based on these allegations,

Plaintiffs contend that Defendants engaged in "accounting gimmickry." (Dkt. 47, Compl. ¶ 10).

Plaintiffs could, however, have discovered the alleged fraud or "accounting gimmickry"

simply by reading Triton's prospectus.  At the very least, a reasonable investor would have thought

that "something may have been amiss," see Sterlin, 154 F.3d at 1203, after reviewing the prospectus.

Plaintiffs themselves assert in the Complaint that:

> 80.   The $15 per share value ascribed to the stock issued to
> IBM was grossly excessive given the fact that the shares of the same
> series C preferred stock were sold for $10 per share only five months
> prior to the IBM transaction.  As stated in the Prospectus, "In October
> 1999 and November 1999, we sold an aggregate 5,052,500 shares of
> our series C preferred stock at a price of $10.00 per share."  The
> $15.00 per share price was thus overstated by no less than 33 1/3%.
> Moreover, the $15 per share value was based on the yet-to-be
> finalized IPO price of the Series C Preferred stock.  At the time of the
> valuation, therefore, the Series C stock had no public offering price.

(Dkt. 47, Compl. ¶ 80).  These assertions are derived from the prospectus.   It is an investor's

responsibility to read the documents, including the prospectus, sent to him by a company with whom

he or she has invested.  Franze, 296 F.3d at 1254 (citing Mathews v. Kidder, Peabody & Co., Inc.,

260 F.3d 239, 252 (3d Cir. 2001) (investors are presumed to have read prospectuses, quarterly

reports and other information relating to their investments); Dodds v. Cigna Sec., Inc., 12 F.3d 346,

350-51 (2d Cir. 1993) (investor's failure to read the documents is not excused by the document's length); Brumbaugh v. Princeton Partners, 985 F.2d 157, 163 (4th Cir. 1993) ("when a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims. . . ."); DeBruyne v. Equitable Life Assur. Soc. of U.S., 920 F.2d 457, 466 n.18 (7th Cir. 1990) ("plaintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice")). (citations modified).

**B.      First Storm Warning: ART's Financial Woes**

In its prospectus, Triton disclosed that it had a three year supply agreement to sell its product to ART, whom it identified as one of its "key" customers.   On   November 14, 2000, Triton announced that ART had requested a delay in delivery of Triton's products to "conserve cash" and obtain additional financing.  (Dkt. 47, Compl. ¶ 70, 150).  In response, Triton's stock price fell 50 percent. (Dkt. 47, Compl. ¶ 151).  Defendants argue that this press release constitutes a "storm warning" and placed Plaintiffs on inquiry notice of the possibility that their legal rights had been infringed by misrepresentations in Triton's prospectus about Triton's prospects and ART's financial viability. Defendants argue that Plaintiffs' securities fraud claims are barred by the statute of limitations because the Plaintiffs failed to commence their lawsuit within one year after this announcement.

In its prospectus, Triton represented that its three year supply agreement with ART was "firm" and that ART was one of Triton's "key" customers.  Indeed, Triton represented in the prospectus that of the $3,497,000 in revenue Triton reported to have earned during the quarter ending March 31, 2000, $3,150,000 had been invoiced to ART.   The November 2000 press release, therefore, issued just four months after the prospectus was filed, cast doubt on the veracity of the

representations concerning the firmness of Triton's supply agreement with ART and Triton's own financial viability, the essence of inquiry notice. Theoharous, 256 F.2d at 1228. Moreover, the drastic 50 percent drop in Triton's stock price, which, according to the Complaint (¶151), was in response to Triton's announcement of ART's financial woes, information undoubtedly contrary to the prospectus, is significant in analyzing whether a reasonable investor would have made inquiry. See Brimo v. Corporate Express, Inc., 229 F.3d 1135 (2d Cir. 2000)(upholding dismissal where press release disclosing information contrary to prior favorable report, and resulting in 50 % decline in stock price, put plaintiff on inquiry notice); Hupp v. Gray, 500 F.2d 993, 996 (7th Cir. 1974)("sharp fall in the market price . . . clearly and painfully revealed to the plaintiff . . . should have aroused suspicion or curiosity ").

In a similar case, the Eleventh Circuit concluded that a company's press release which warned of "cashflow deficiencies" and "financial difficulties," along with its subsequent bankruptcy filing, was sufficient to put the plaintiff on inquiry notice of the possibility that the company had committed securities fraud. Theoharous, 256 F.3d at 1228. Here, Triton's press release disclosing its key customer's financial difficulties which resulted in the customer's request for delivery delays and its need to conserve cash and obtain additional financing was sufficient to put Plaintiffs on inquiry notice of the possibility that Triton had made misrepresentations in its prospectus. Triton had disclosed in its prospectus that it relied on its key customers "for substantially all of [its] sales and that the "loss of one or more of [its] current customers, a reduction in sales to them or the failure to sell [its] products to additional service providers would significantly reduce [its] future revenues."

13

(Dkt. 57, Ex. at 9).[8]  Given Triton's express reliance on ART as a key customer and Triton's press release disclosing ART's financial difficulties, a reasonable investor would have believed that something was amiss and would have inquired further.  Plaintiffs were, therefore, on inquiry notice concerning the stability of Triton's key customer by November 14, 2000.

Once Plaintiffs were on notice concerning their claims that Triton had committed securities fraud in the valuation of its assets and that Triton had made material misrepresentations concerning the financial stability of Triton's key customer, ART, Plaintiffs were deemed to have constructive notice of all facts which could have been discovered through diligent investigation during the limitations period.  See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1326 (3d Cir. 2002) (once plaintiffs were on inquiry notice, they are "held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period"); Dodds, 12 F.3d at 352 (storm warning was sufficient to raise a duty to inquire further and an "investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice"); see also Theoharous, 256 F.3d at 1228 (inquiry notice is "triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself") (emphasis in original).

Triton's November 2000 press release announcing ART's financial woes and "indicating that ART's financial health and Triton's revenues from the ART contract were in jeopardy – issued only

---

[8] To the extent Plaintiffs attempt to distinguish Theoharous by pointing out in that case, it was the company itself which ultimately went bankrupt, as opposed to a customer of the company, with respect to the instant case, that is a distinction without a difference. For purposes of analyzing whether the instant plaintiffs were on inquiry notice as a result of ART's financial difficulties and its eventual bankruptcy, given that virtually all of Triton's revenue was generated through sales to ART and that Triton's financial viability was therefore virtually wholly dependent on its agreement with ART, there could be little doubt to a reasonable investor that Triton's financial well being was tied to ART's financial well being.

four months after the prospectus which had touted the importance of Triton's contract with ART, and causing the Company's stock price to decline by half – was clearly a 'storm warning' putting plaintiffs on inquiry notice that 'something might have been amiss.'" (Dkt. 53, Individual Defendants' Motion to Dismiss, at 9).

After the "storm warning" concerning Triton's key customer and veracity of the information in the prospectus, Plaintiffs should have made inquiry and investigated the possibility that fraud existed. Had Plaintiffs done so, they could have interviewed Triton's former employees concerning the reliability of Triton's product just as Plaintiffs were able to accomplish more than a year after the "storm warning." See (Dkt. 47, Compl. ¶¶ 48-56). Through a limited inquiry, Plaintiffs also could have discovered their claims concerning the interlocking or related directors and officers of Triton, ART and CAVU, as that information was public. Additionally, Plaintiffs could have discovered the facts underlying their claims regarding Triton and Ernst & Young's financial accounting by interviewing former employees of Triton, ART and/or CAVU or reviewing the publicly filed financial documents.[9] These matters, which Plaintiffs were able to discover during the course of a year, could have and should have been discovered within one year after the storm warning and a careful reading of the prospectus. Because Plaintiffs did not do so, their claims are barred by the applicable statutes of limitation.

## C.     Second Storm Warning

In March 2001, just four months after Triton's press release regarding ART's financial woes, ART announced it was seeking bankruptcy protection. At the very latest, therefore, by March 2001,

---

[9]  The factual basis for the Complaint is largely based on information Plaintiffs gathered from former Triton employees who Plaintiffs assert had left Triton's employ prior to November 14, 2001. See (Dkt. 47, Compl. ¶¶ 17, 18, 50, 53-56, 60-62, 64, 104, 105, 156-58, 165, 184, 187, 188).

more than a year before this case was filed, any reasonable investor would have been on inquiry notice that Triton's key customer was not financially stable and Triton itself could not have been financially stable.

By March 2001, therefore, Plaintiffs knew or were on inquiry notice that: (1) ART was filing for bankruptcy protection; (2) most if not all of Triton's revenues and financial success depended on sales to ART, (3) the "loss of one or more of [Triton's] current customers, a reduction in sales to them or the failure to sell [its] products to additional service providers would significantly reduce [Triton's] future revenues;" and (4) Triton's valuation of its assets was based on fraudulent "accounting gimmickry." Any reasonable investor having the information that was available to Plaintiffs would have made an investigation into the possibility that fraud had been perpetrated through the representations in Triton's prospectus. Plaintiffs could have discovered the basis for their claims had they made an investigation once they were on notice of ART's financial woes.[10]

---

[10] To the extent Plaintiffs argue that the issues of notice and their ability to discover the possibility that fraud existed should be determined by the trier of fact in accordance with Smith v. Duff and Phelps, Inc., 891 F.2d 1567 (11th Cir. 1990) and Kennedy v. Tallant, 710 F.2d 711 (11th Cir. 1983), those cases are distinguishable. In Kennedy, the defendant corporation and its directors allegedly "exerted great effort concealing their fraudulent purposes" and falsified corporate documents. 710 F.2d at 716. Additionally, the prospectus "contained no clear statement or explanation of the facts which support" the plaintiff's claim. Id. Here, however, by Plaintiffs' own admission, Triton's prospectus reflected that the company overvalued the purchase of assets from IBM. (Dkt. 47, Compl. ¶ 80). Thus, Plaintiffs claims of "accounting gimmickry" could have been discovered and Plaintiffs' case is more similar to Franze, 296 F.3d 1250, in this regard. In Duff, the Court determined that the issue of whether a reasonable person was on notice of fraud after receiving two letters regarding an acquisition and after reading newspaper reports concerning the per share purchase price, was best resolved by a jury. 891 F.2d at 1571-72. The plaintiff in Duff did not have information from which he could have concluded that the purchase price was fraudulently low. Id. Duff is distinguishable from Plaintiffs' case because Plaintiffs had full knowledge of the value ascribed to the stock issued to IBM as well as the lower value the stock was sold for only five months prior to the IBM transaction. (Dkt. 47, Compl. ¶ 80). The disclosures in the prospectus along with the press releases concerning ART's financial woes and ART's subsequent bankruptcy distinguish this case from Duff and Kennedy.

Plaintiffs failed to file their lawsuit within one year after they were on inquiry notice concerning the possibility that their legal rights had been infringed. This action must therefore be dismissed.  Securities fraud claims are subject to dismissal when, as here, the facts necessary to trigger inquiry notice are apparent from the face of the complaint and the one year statute runs before suit is commenced.  See Franze, 296 F.3d at 1254 (reversing class certification and concluding that statute of limitation barred claims); Theoharous, 256 F.3d at 1228 (affirming dismissal based on statute of limitations); Dodds, 12 F.3d at 350-52 (affirming dismissal based on statute of limitations). Accordingly, it is

**ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint (Dkts. 52, 54, 58) are **GRANTED**.  The Consolidated Amended Complaint is **DISMISSED** as barred by the applicable statutes of limitations.  The Clerk is directed to deny all pending motions as moot and close this case.

**DONE AND ORDERED** in chambers this ___26th___ day of September, 2003.

**JAMES D. WHITTEMORE**
**United States District Judge**

cc: Counsel of Record, Law Clerk

17

F I L E   C O P Y

Date Printed: 09/29/2003


Notice sent to:

   \_\_\_   Kenneth Vianale, Esq.
         Vianale & Vianale LLP
         5355 Town Center Rd., Suite 801
         Boca Raton, FL  33486

         8:02-cv-01041    jlg

   \_\_\_   Maya Saxena, Esq.
         Milberg, Weiss, Bershad, Hynes & Lerach
         5355 Town Center Rd., Suite 900
         Boca Raton, FL  33486

         8:02-cv-01041    jlg

   \_\_\_   Tara Isaacson, Esq.
         Milberg, Weiss, Bershad, Hynes & Lerach
         5355 Town Center Rd., Suite 900
         Boca Raton, FL  33486

         8:02-cv-01041    jlg

   \_\_\_   Howard K. Coates Jr., Esq.
         Milberg, Weiss, Bershad, Hynes & Lerach
         5355 Town Center Rd., Suite 900
         Boca Raton, FL  33486

         8:02-cv-01041    jlg

   \_\_\_   Steven G. Schulman, Esq.
         Milberg, Weiss, Bershad, Hynes & Lerach, LLP
         One Pennsylvania Plaza
         49th Floor
         New York, NY  10119-0165

         8:02-cv-01041    jlg

   \_\_\_   Samuel H. Rudman, Esq.
         Cauley Geller Bowman & Rudman LLP
         200 Broadhollow Rd., Suite 406
         Melville, NY  11747

         8:02-cv-01041    jlg

   \_\_\_   Jules Brody, Esq.
         Stull, Stull & Brody
         6 East 45th Street
         New York, NY  10017

         8:02-cv-01041    jlg

___ Aaron Brody, Esq.
Stull, Stull & Brody
6 East 45th Street
New York, NY  10017

8:02-cv-01041    jlg

___ Gary Lee Sasso, Esq.
Carlton Fields, P.A.
One Progress Plaza
200 Central Ave., Suite 2300
P.O. Box 2861
St. Petersburg, FL  33731

8:02-cv-01041    jlg

___ Jill H. Bowman, Esq.
Carlton Fields, P.A.
One Progress Plaza
200 Central Ave., Suite 2300
P.O. Box 2861
St. Petersburg, FL  33731

8:02-cv-01041    jlg

___ K. Renee Schimkat, Esq.
Carlton Fields, P.A.
4000 Bank of America Tower
100 S.E. 2nd St.
P.O. Box 019101
P.O. Box 019101
Miami, FL  33131-9101

8:02-cv-01041    jlg

___ Jeffrey B. Rudman, Esq.
Hale & Dorr, LLP
60 State St.
Boston, MA  02109

8:02-cv-01041    jlg

___ Daniel W. Halston, Esq.
Hale & Dorr, LLP
60 State St.
Boston, MA  02109

8:02-cv-01041    jlg

___ Christine M. Trowbridge, Esq.
Hale & Dorr, LLP
60 State St.
Boston, MA  02109

8:02-cv-01041    jlg

___ Samuel J. Salario Jr., Esq.
Carlton Fields, P.A.
P.O. Box 3239
Tampa, FL  33601-3239

8:02-cv-01041    jlg

___   James B. Murphy Jr., Esq.
      Shook, Hardy & Bacon, L.L.P.
      100 N. Tampa St., Suite 2900
      P.O. Box 898
      Tampa, FL  33602-5810

8:02-cv-01041    jlg

___   David J. Onorato, Esq.
      King & Spalding
      191 Peachtree St., N.E.
      Atlanta, GA  30345-1763

8:02-cv-01041    jlg

___   C. Lawrence Stagg, Esq.
      Akerman Senterfitt
      100 S. Ashley Dr., Suite 1500
      P.O. Box 3273
      Tampa, FL  33601-3273

8:02-cv-01041    jlg

___   Stanley Howard Wakshlag, Esq.
      Akerman Senterfitt
      Suntrust International Center
      1 S.E. 3rd Ave., 28th Floor
      Miami, FL  33131-1714

8:02-cv-01041    jlg

___   Lawrence S. Robbins, Esq.
      Robbins, Russell, Englert, Orseck & Untereiner LLP
      1801 K St., N.W., Suite 411
      Washington, DC  20006

8:02-cv-01041    jlg

___   Jack E. Reise, Esq.
      Cauley, Geller, Bowman & Rudman, LLP
      2255 Glades Rd., Suite 421A
      Boca Raton, FL  33431

8:02-cv-01041    jlg

___   Jonathan M. Stein, Esq.
      Cauley, Geller, Bowman & Rudman, LLP
      2255 Glades Rd., Suite 421A
      Boca Raton, FL  33431

8:02-cv-01041    jlg

___   Andrew L. Barroway, Esq.
      Schiffrin & Barroway, LLC
      Three Bala Plaza E., Suite 400
      Bala Cynwyd, PA  19004

8:02-cv-01041    jlg

____ Stuart L. Berman, Esq.
Schiffrin & Barroway, LLC
Three Bala Plaza E., Suite 400
Bala Cynwyd, PA  19004

8:02-cv-01041    jlg

____ Darren J. Check, Esq.
Schiffrin & Barroway, LLC
Three Bala Plaza E., Suite 400
Bala Cynwyd, PA  19004

8:02-cv-01041    jlg

____ Marc A. Topaz, Esq.
Schiffrin & Barroway, LLC
Three Bala Plaza E., Suite 400
Bala Cynwyd, PA  19004

8:02-cv-01041    jlg

____ Mel E. Lifshitz, Esq.
Bernstein Liebhard & Lifshitz, LLP
10 E. 40th St., 22nd Floor
New York, NY  10016

8:02-cv-01041    jlg

____ Gregory M. Egleston, Esq.
Bernstein Liebhard & Lifshitz, LLP
10 E. 40th St., 22nd Floor
New York, NY  10016

8:02-cv-01041    jlg

____ Fred T. Isquith, Esq.
Wolf, Haldenstein, Adler, Freeman & Herz
270 Madison Ave.
New York, NY  10016

8:02-cv-01041    jlg

____ Charles Piven, Esq.
Law Offices of Charles J. Piven, P.A.
World Trade Center, Suite 2525
401 E. Pratt St.
Baltimore, MD  21202

8:02-cv-01041    jlg